**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT DAYTON**

| | | |
|---|---|---|
| MAJOR SEAN BARNETT, | : | |
| | : | |
| Plaintiff, | : | Case No. 3:25-cv-228 |
| | : | |
| v. | : | |
| | : | Judge Thomas M. Rose |
| DEFENSE HEALTH AGENCY, | : | |
| | : | Magistrate Judge Michael R. Merz |
| Defendant. | : | |

---

**ENTRY AND ORDER DENYING PLAINTIFF'S RENEWED MOTION FOR PARTIAL SUMMARY JUDGMENT (DOC. NO 88), PLAINTIFF'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD (DOC. NO. 96), AND PLAINTIFF'S MOTION FOR CLARIFICATION AND REQUEST FOR LIMITED REDACTION (DOC. NO. 100); GRANTING DEFENDANT'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD (DOC. NO. 97)**

---

The present matter, being brought pursuant to the Administrative Procedures Act, 5 U.S.C. § 701, *et seq.* (the "APA"), is currently before the Court for consideration of three dispositive motions. Plaintiff Major Sean Barnett ("Barnett"), proceeding *pro se*, has submitted Plaintiff's Renewed Motion for Partial Summary Judgment (Doc. No. 88) and Plaintiff's Motion for Judgment on the Administrative Record (Doc. No. 96) (together, "Plaintiff's Motions"), seeking reversal of Defendant the Defense Health Agency's ("DHA") decision to revoke Barnett's privileges to practice medicine. On the other side, the DHA has filed Defendant's Motion for Judgment on the Administrative Record ("Defendant's Motion" or "DHA's Motion") (Doc. No. 97), seeking to uphold the same privileging decision. Also pending is Plaintiff's Motion for Clarification and Request for Limited Redaction (Doc. No. 100), which the Court shall deny as a

preliminary matter to its analysis below. In substance, for the reasons that follow, the Court **DENIES** Plaintiff's Motions and **GRANTS** DHA's Motion (collectively, the "Motions").

## I. BACKGROUND[1]

In summation, Barnett was, at all times relevant here, a board-certified nephrologist who served his tour of duty with the Air Force in the Wright-Patterson Air Force Base 88th Medical Group, at the Wright-Patterson Medical Center ("WPMC"). (*See e.g.*, Doc. No. 90-9 at DHA_4362.) In 2023, when DHA officials received allegations of Barnett's professional misconduct, clinical deficiencies, and lack of clinical competence, DHA summarily suspended Barnett's privileges to practice medicine at WPMC pending a quality assurance investigation. (*See* Doc. No. 90-3 at DHA_0097.) What ensued over the next couple of years would ultimately see Barnett's privileges to practice medicine at WPMC revoked altogether. (*See* Doc. 90-9 at DHA_4374.) He now wishes to have that final action reversed under the banner of the APA. (Doc. No. 1 at PageID 4-6.)

To best detail the instant scenario, the Court would break Barnett's story up into the following parts: first, the Court takes a brief look at Barnett, as he appeared before the DHA; second, the Court examines the DHA policy manual provided with the Administrative Record ("Record") (Doc. No. 90), as it is applicable to the adverse administrative action Barnett faced; thirdly, with that context, the Court sets out the administrative processes Barnett was in-fact subjected to by the DHA; and, finally, the Court confirms the procedural posture of the case.

### a. Barnett

[1] Due to the voluminosity of the Administrative Record, the Court shall refer to said record by citing the document number appearing on the docket and the corresponding Bates-Stamped page number provided by DHA here. By way of example, the Court will cite to the Administrative Record in the following manner: (Doc. No. XX at DHA_YYYY.)

When the events of this case began to unfold, Barnett was an osteopathic physician who was serving as a staff nephrologist at WPMC. (Doc. No. 90-3 at DHA_ 0109; 90-4 at DHA_0266-0267.) After graduating from medical school in 2016, Barnett shaped his practice serving in the Air Force. (*See* Doc. No. 90-4 at DHA_0266.) He completed an internal medicine residency at WPMC in June 2019. (*Id.*) He then completed a fellowship in nephrology at the San Antonio Uniformed Services Health Education Consortium in mid-2021. (*Id.*) As of April 2023, Barnett was board-certified in both internal medicine and nephrology. (*Id.* at DHA_0257.)

Notwithstanding, Barnett's credentials are somewhat blemished by a critical care fellowship at The University of Texas Health Science Center at San Antonio, which he failed to complete. (*Id.* at DHA_0266.) Barnett entered this critical care fellowship in July of 2021 and was dismissed by March of 2022. (*Id.*) To specify, Barnett was dismissed from his critical care fellowship based on findings that he had endangered patient safety and shown poor clinical competence, and for behaving disruptively and unprofessionally. (Doc. No. 90-3 at DHA_0212.) The University of Texas review panel found that Barnett was taking liberties with the care of other providers' patients and consulting on patient care matters that were outside the scope of his training program. (*Id.*) Barnett challenged these findings to no avail. (*See id.* at DHA_0214-0223.)

In the months that followed, Barnett would return to WPMC. In June of 2022, a supervising physician, identified in the Record as LTCOL 2, issued Barnett an initial letter of counseling. (Doc. No. 90-4 at DHA_0347-0351.) Therein, LTCOL 2 acknowledged aspects of Barnett's then-budding career that created cause for concern, namely that Barnett: previously failed to pass his nephrology boards; was dismissed from his critical care fellowship; received poor marks in the areas of professionalism, professional judgment, competence, and skill; had received counseling on his inappropriate use of social media while affiliating himself with the Air Force;

and, was counseled and encouraged to seek mental health treatment for his self-described mental health concerns. (*Id.* at DHA_0347.) LTCOL 2 concluded the initial counseling letter by advising that "[t]he importance of making the appropriate changes in [Barnett's] professional and personal behaviors cannot be overstated. [Barnett's] success or failure in the next 24 months hinges upon [Barnett's] chosen actions." (*Id.* at DHA_0351.) On August 5, 2022, Barnett was placed on a focused professional practice evaluation plan where he would be monitored and evaluated by a preceptor. (*Id.* at DHA_0264.) He then completed that plan on October 12, 2022, without incident. (*Id.* at DHA_0264-0265.)

But, as will be discussed in greater detail below, Barnett continued to create friction amongst his colleagues, even if those colleagues appreciated some of Barnett's underlying talents. By May of 2023, Barnett became known for generally unprofessional conduct, flouting the appropriate standard of care, interjecting with recommendations outside his area of expertise, and treating patients he had not been consulted on to begin with. (*See e.g.*, Doc. No. 90-3 at DHA_0133-0139.) On balance though, Barnett's colleagues did not doubt his intelligence, with at least one commenting that Barnett "is gifted with a very creative mind, and he is in fact very forward thinking." (*Id.* at DHA_0162.)

**b. <u>The DHA Procedures Manual</u>**

Fundamentally, the DHA serves as the privileging authority for military medical facilities like WPMC and has created procedures to ensure adequate clinical quality management at those facilities. (*See* Doc. No. 90-2 at DHA_0001, DHA_0012.) The DHA has established a healthcare risk management program, designed to:

(a) Advance safe, trusted, and effective healthcare[;]
(b) Promote a fair and just culture[;]
(c) Use risk data/trends to prioritize risks and strategic responses to those risks[;]

(d) Manage risks effectively[;]
(e) Use strategies to reduce financial losses to the government[;]
(f) Encourage organization and individual accountability[;]
(g) Optimize organizational preparedness and performance.

(*Id.* at DHA_0007-0008.)

In aid of these guiding principles, the DHA Procedures Manual, No. 6025.13, Vol. 3 ("DHA Manual" or, the "Manual"), contains several pertinent definitions. As a foundation, "clinical privileges" refer to "[p]ermission granted by the [DHA] to provide medical and other patient care services." (*Id.* at DHA_0009.) The Manual broadly defines "clinical adverse action" as "[a]ction invoked against a healthcare provider … with the result that the authority to practice clinically is adversely affected." (*Id.* at DHA_0008.) In particular, clinical adverse actions are taken in response to "evidence of misconduct, impairment, incompetence," or any other behavior by a healthcare provider that could adversely affect patient safety. (*Id.*) The Manual further defines "adverse privileging action," as the "[d]enial, restriction, reduction, or revocation of clinical privileges as a result of due process professional review action …." (*Id.*) A healthcare provider operating under the DHA's privileging authority may have his clinical privileges temporarily restricted or revoked entirely, as a result of peer review. (*Id.* at DHA_0013.) Meanwhile, the Manual permits that a provider's privileges to practice may be summarily suspended "based on [a] determination by the [DHA] for concerns regarding suspected misconduct, impairment, incompetence," or any conduct adversely affecting patient safety. (*Id.*) A summary suspension is defined as "[t]he temporary removal of all or a portion of a healthcare provider's privilege(s) … prior to the completion of due process procedures …." (*Id.*)

If it appears that a given healthcare provider has engaged in misconduct or incompetence that poses a substantial risk to patient safety, clinical adverse actions at facilities like WPMC generally begin with the initiation of a quality assurance investigation ("QAI") and a summary

suspension of the provider's privileges. (*See id.* at DHA_0029-0032.) When a provider's privileges are summarily suspended, "[t]he individual will be notified in writing on the day clinical privilege(s)/practice were placed in summary suspension." (*Id.* at DHA_0030.) The provider's privileges will then remain in summary suspension while a QAI is conducted. (*Id.* at DHA_0029.) If the summary suspension of a provider's privileges lasts longer than 30 days, the suspension must be reported to the National Practitioners Database ("NPDB"). Otherwise, a QAI is to be conducted by an unbiased peer of the provider under investigation and conducting the QAI is to be the selected investigator's sole duty until it is completed. (*Id.* at DHA_0032.) When the investigator completes his report, he must provide an evidence-based recommendation to reinstate, restrict, reduce, revoke, or deny the subject provider's privileges to practice. (*Id.* at DHA_0034.) The provider subject to QAI may subsequently submit a written statement in response to the investigator's report within 15 days, or longer if an extension is granted. (*Id.*)

The QAI report, evidence, and any provider statement are then forwarded to a credentials committee, comprised of a panel of three privileged providers, with at least one being a peer to the provider under review. (*Id.* at DHA_0035.) Once the committee considers the submitted materials, the panel is obligated to provide a recommendation to the DHA for reinstatement, revocation, or denial of the provider's privileges. (*Id.* at DHA_0035-0036.)

By this framework, the DHA proceeds with another review of its own and renders a proposed decision regarding the subject provider's privileges. (*Id.* at DHA_00036.) The DHA must notify the provider in writing of its proposed decision within 10 days after receiving the record on review. (*Id.*) If the DHA decides to reinstate the provider's privileges—with or without monitoring and evaluation—the DHA's proposed decision is in-fact final. (*Id.*) On the other hand,

if the DHA proposes to restrict or revoke the provider's privileges, the organization "must advise the individual in writing of [his] right to a peer review hearing and appeal rights." (*Id.*)

Upon receiving written notification, the subject provider may appeal the DHA's proposed action with respect to his clinical privileges within 30 calendar days. (*Id.* at DHA_0036-0037.) Any peer review hearing must not be held earlier than 30 days after receipt of the DHA's proposed decision. (*Id.* at DHA_0038.) Written notice of a peer review hearing must be made to the subject provider and that notice shall include information such as the date and time of the hearing, and the names of any witnesses expected to testify. (*Id.*) The hearing itself is quasi-judicial, with three unbiased peers serving as factual adjudicators, while the government's legal counsel advises on questions of law and procedure. (*Id.* at DHA_0040-0042.)

At the close of evidence, the peer review panel adjourns and deliberates off the record, whereas the hearing itself is to be transcribed. (*Id.* at DHA_0042.) Like the credentials committee involved earlier in the process, the peer review panel submits the record on appeal, along with a recommendation, back to the DHA. (*Id.*) The privileging authority is accordingly tasked with reviewing the panel's recommendations regarding the subject provider's clinical privileges. (*Id.*) While the DHA is not technically bound by the peer review panel's recommendations, the privileging authority must justify its decision with rationale drawn from the peer review proceedings. (*Id.* at DHA_0043.)

Finally, if a provider disagrees with the privileging authority's decision, he may appeal within 10 days and any final decision must be issued within 14 days thereafter. (*Id.*) A separate report authority goes on to review the appeal and render a final decision respecting the provider's privileges. (*Id.* at DHA_0045-0046.) This report authority is further responsible for reporting the final outcome of a clinical adverse action to the NPDB. (*Id.* at DHA_0046.)

### c. The Events of this Case

#### 1) Barnett's First Clinical Adverse Action

In May 2023, the DHA summarily suspended Barnett's clinical privileges and initiated a QAI into allegations of Barnett's professional misconduct, clinical deficiencies, and lack of clinical competence between December 2022 and May 2023. (*See* Doc. No. 90-3 at DHA_0097-0101.) It appears from the Record that Barnett's privileges were suspended on May 9, 2023. (*Id.* at DHA_0097-0098.) Though, contrary to the DHA Manual's required procedures, it seems that Barnett was not notified of the suspension until May 17, 2023, when a QAI officer was selected to investigate the allegations against Barnett. (*Id.* at DHA_0100-0104.) Nonetheless, by May 17, 2023, Barnett's privileges were suspended and a QAI was underway.

The QAI officer, identified in the Record as LTCOL 3, reviewed various documents in the course of their investigation. (*See id.* at DHA_0122-0123.) Among these documents were memorandums, effectively serving as affidavits, written by Barnett's colleagues to establish a record of the allegations against him. (*Id.*) As early as March of 2023, Barnett's colleagues were complaining of Barnett's "high risk behavior," to include inappropriately taking the lead on patients that were not his to treat and inaccurately documenting patient conditions in the medical chart. (*Id.* at PageID 0167-0168.) This kind of high risk behavior ultimately led a sizable number of Barnett's colleagues to author memorandums of their own with similar observations about him. The chief of medical staff at WPMC additionally interviewed those colleagues and produced a cumulative memorandum reflecting the thrust of all the allegations against Barnett. (*Id.* at DHA_0133-0139.) All told, Barnett's colleagues accused him of: interfering with attending physicians' primary care of patients (*Id.* at DHA_0133-0134, DHA_0135-0137); reviewing the charts of patients he was not consulted on (*Id.* at DHA_0134); prescribing risky treatments, an

allegation Barnett purportedly admitted to out of confidence in his own skills (*Id.* at DHA_0135); and, being aggressive and unprofessional with his colleagues when they did not take his recommendations (*Id.* at DHA_0134-0135).

LTCOL 3 checked these allegations against medical records, emails and text messages between Barnett and his colleagues, Barnett's personnel files, and six witness interviews. (*Id.* at DHA_0109.) On allegations of misconduct, the investigator considered seven instances where Barnett was reviewing patient charts without authorization, making inappropriate chart notes, or overstepping the bounds of his role as a consultant in a way that could disrupt patient care. (*Id.* at DHA_0110-0113.) LTCOL 3 then concluded that there was an abundance of evidence Barnett acted unprofessionally in these seven instances and tended to create an environment where Barnett's colleagues avoided consulting with him. (*Id.* at DHA_0119.) As for clinical deficiencies, LTCOL 3 found evidence that Barnett did not always perfectly chart his treatments, but generally he showed no signs that he was out of step clinically. (*Id.* at DHA_0113-0117, DHA_0119-0120.) However, LTCOL 3 did report there was an abundance of evidence that Barnett made high risk clinical recommendations, stating, "Maj[.] Barnett has repeatedly obviated patient safety over the execution of his preferred treatment plan." (*Id.* at DHA_120.) In one instance, Barnett prescribed a treatment based on a single study and then failed to follow up with the patient. (*Id.* at DHA_0117-0118.) This type of behavior was particularly concerning in light of Barnett's insistence upon using riskier treatments as a matter of course. (*Id.* at DHA_120, DHA_0178-0179.) At the end of the QAI report LTCOL 3 recommended that Barnett's privileges to practice be reinstated with the implementation of a monitoring and evaluation plan. (*Id.* at DHA_0121.)

DHA provided Barnett with a redacted copy of the QAI report on July 20, 2023, and Barnett responded on August 18, 2023, after receiving an extension of time to do so. (Doc. No. 90-5 at DHA_2450, DHA_2453-55.) Barnett began his response by accepting responsibility for his shortcomings as a professional communicator. (*Id.* at DHA_2455-56.) Outside of that though, Barnett hotly contested any findings in the QAI related to his competence and clinical judgment. (*Id.* at DHA_2456-63.) For example, refuting a claim that he inappropriately prescribed 3% saline to patients, Barnett, based on his own clinical analysis, stated:

> In my hands, 3% Saline is the best and most versatile [intravenous fluid], diuretic (standalone diuretic), diuretic adjunct, Sodium treatment, and diagnostic tool. I wish I call myself a 3% Wizard.

(*Id.* at DHA_2462.) Barnett concluded his personal statement by agreeing on the reinstatement of his privileges, but objected to the implementation of a monitoring and evaluation plan because he "believe[d] four months of this hell ha[d] been enough punishment already," and he did not believe monitoring and evaluation would be a fruitful use of time. (*Id.* at DHA_2463-64.) In addition to his statement, Barnett retained private counsel to submit a legal memo on his behalf, essentially arguing that Barnett had been prejudiced thus far by not being included in the QAI's evidence gathering process. (*Id.* at DHA_2467-69.)

The credentials committee convened on August 25, 2023, to consider the QAI report and Barnett's responses. (*See id.* at DHA_2472.) The committee found by a preponderance of the evidence that Barnet had engaged in professional misconduct, tended to make high risk clinical recommendations, and—despite LTCOL 3's finding to the contrary—exhibited clinical deficiencies that could or did have an adverse effect on patient care. (*Id.* at DHA_2474-75.) At that time, the credentials committee voted to recommend the revocation of Barnett's clinical privileges in total. (*Id.* at DHA_2475.)

By procedure, a privileging official for the DHA, identified as COL 4, rendered a proposed decision in Barnett's case on September 20, 2023. (*Id.* at DHA_2477-78.) COL 4 considered the recommendations made and Barnett's personal statement. (*Id.*) Regarding the latter, COL 4 noted the humility Barnett showed in accepting responsibility for his part in interpersonal conflicts and decided to reinstate Barnett's clinical privileges with monitoring and evaluation, as the QAI report suggested. (*Id.*) A revision-to-action report was lodged with the NPDB for Barnett and, because monitoring and evaluation is not technically adverse action under the DHA Manual, COL 4's decision marked the end of official administrative action for a brief time. (*Id.*)

**2) <u>Barnett's Second Clinical Adverse Action</u>**

The DHA again summarily suspended Barnett's privileges to practice at WPMC on November 20, 2023. (*Id.* at DHA_2479-80.) This time, Barnett faced allegations of professional misconduct during his period of monitoring and evaluation. (*Id.* at DHA_2479.) The DHA identified the allegations against Barnett, "to include inappropriate conflict resolution" when his colleagues and preceptors disagreed with him, communicating argumentatively and aggressively, circumventing the on-call admitting team, attempting to coerce other providers into acquiescing to Barnett's treatment plans, and inaccurately documenting patient encounters. (*Id.*)

A QAI officer, identified as LTCOL 6, was assigned on December 1, 2023, after the Thanksgiving holiday, and LTCOL 6 issued a corresponding QAI report on January 29, 2024. (*Id.* at DHA_2496-97, DHA_2500-06.) Throughout this second QAI, LTCOL 6 reviewed two particular events on which the allegations of misconduct against Barnett were based. (*See id.* at DHA_2501-04.) The first involved an elderly outpatient who Barnett treated in his dialysis clinic, and who Barnett believed needed to be admitted to WPMC's intensive care unit after falling. (*Id.* at DHA_2501-02.) Barnett tried twice, on November 3 and November 15, 2023, to have this

patient admitted to the ICU and he was twice told to direct the patient to the emergency room for appropriate care. (*See id.*) The second time, Barnett went around the admissions team that originally rebuffed his request, stating the following in text messages to other colleagues:

> I am trying really really hard to be flexible, but I am not getting the same sense from the [internal medicine] teams. At all.
>
> This is a bit ridiculous, if I have to file a [patient safety report] because I was concerned about falls, my concerns were dismissed, and the patient fell… I will? I am trying really hard to work with y'all. It is not being reciprocated.

(*Id.* at DHA_2551.) As for the second event, LTCOL 6 observed an instance where Barnett received pushback on treating a patient with immunosuppressants. (*Id.* at DHA_2503.) When Barnett's preceptor disagreed with this course of action, Barnett responded:

> [P]lease notify me if you … are going to give me an order to "not treat this patient the way I believe is clinically appropriate, based on available evidence and guidelines," in which case I will discuss the order with you all, plead my case, and if you still disagree I will turn the case over to you ….

(*Id.* at DHA_2536.) What is more, although this patient encounter occurred on November 8, 2023, Barnett did not finish documenting the encounter and treatment plan until November 21, 2023, when his privileges were already in summary suspension. (*Id.* at DHA_2503.) In addition, LTCOL 6 considered Barnett's history and his general reluctance to accept the conditions of monitoring and evaluation that had been placed on him. (*Id.* at DHA_2502.) Specifically, Barnett told his preceptors that they were handicapping his care because they did not see what he could see and stated:

> I do not feel comfortable with it and I do not like that it goes this way, every time. I do not get to treat my patients my way, and neither of you will give me any leeway, nor benefit of the doubt, even after what you have seen I am capable of? Okay, I hate it, it is not the right answer for patients either. But you're the bosses.

(*Id.* at DHA_2516.) In the end, LTCOL 6 recommended the revocation of Barnett's clinical privileges entirely. (*Id.* at DHA_2504-05.)

The QAI, corresponding evidence, and Barnett's response were all forwarded along in the process, as contemplated by the DHA Manual, much the same as Barnett's first clinical adverse action at WPMC. (*See* Doc. No. 90-6 at DHA_2967-72, DHA_2974-75.) On April 19, 2024, the DHA proposed to revoke Barnett's clinical privileges, rather than reinstate them with some modicum of monitoring and evaluation. (*Id.* at DHA_2974-75.) With this recommendation, Barnett was further advised of his right to appeal the DHA's proposed decision to a peer review panel. (*Id.*)

Barnett promptly pursued an appeal of the DHA's proposed decision on April 22, 2024. (*Id.* at DHA_2981-82.) The peer review hearing did not begin until November 4, 2024, though, due to scheduling conflicts with Barnett's attorney and difficulty compiling an unbiased panel of Barnett's peers. (*Id.* at DHA_2983-98.) At any rate, when the DHA notified Barnett of his November 4 hearing, the agency provided him with a list of witnesses who might be called to testify and the documents relied on by LTCOL 6 in conducting the second QAI. (*Id.* at DHA_2998-3001.)

The assigned peer review panel heard Barnett's case over three days. (Doc. No. 90-6 at DHA_3020-3130; Doc. No. 90-7 at DHA_3161-3376; Doc. No. 90-8 at DHA_3897-4138.) On day one, Barnett and all other parties involved defined the scope of the proceedings that were about to take place. (*See generally* Doc. No. 90-6 at DHA_3020-3130.) With the assistance of legal counsel, Barnett lodged evidence of his own and objected to certain evidence and processes against him. (*See id.* at DHA_3064-65, DHA_3072-75.) Of note, Barnett won an objection where he sought the exclusion of evidence compiled against him during the first QAI, earlier in 2023. (*See id.* at DHA_3094.) On the second day, the panel heard the testimony of Barnett's colleagues and preceptors. (*See generally* Doc. No. 90-7 at DHA_3161-3376.) In brief, those witnesses testified

to the events reported in their memoranda, which were used to launch a QAI into Barnett's conduct. (*Id.*) Finally, on day three, Barnett took the stand to testify on his own behalf. (*See generally* Doc. No. 90-8 at DHA_3897-4138.) Throughout his testimony, Barnett held steadfast that he had done nothing wrong clinically and framed his interpersonal disputes as attempts to hamstring him. (*See id.* at DHA_3928-29.) In this vein, Barnett did not necessarily refute the allegations against him, as much as try to recharacterize them a bit from his perspective. (*See id.* at DHA_3986-88.) Still, when questioned by the panel, Barnett confirmed such accusations as his failure to timely and accurately document patient encounters in the medical chart. (*See id.* at DHA_4036-44.) In closing, Barnett argued that the misconduct he was accused of was really the product of miscommunication and a general disdain that Barnett's colleagues had for him. (Doc. No. 9-9 at DHA_4117-28.)

On December 2, 2024, the peer review panel issued its report, unanimously recommending the revocation of Barnett's clinical privileges at WPMC. (*Id.* at DHA_4196-4200.) The panel reviewed the evidence before it and found that Barnett was aggressive and unprofessional in his communications when others did not agree with him. (*Id.*) For example, the panel interpreted Barnett's text message indicating that he might file a patient safety report as a threat to his fellow providers if they did not adopt his preferred treatment plan. (*Id.* at DHA_4197-98.) The panel also found that Barnett had failed to properly document certain patient encounters. (*Id.* at DHA_4198-99.) These events, and others like them in the record, justified revocation of Barnett's clinical privileges because:

> While [Barnett] has been out of clinical practice, he has shown great efforts and initiative working in Education and Training. While this is to be lauded, it does not address the concern that he seems unable to acknowledge his role in [] interpersonal difficulties nor provide evidence that he can own or resolve them appropriately. He maintains an air of unearned confidence in the correctness of his decisions, despite an inability to articulate his rationale in a professional or persuasive manner. By his

> own admission, [Barnett] believes it necessary to have an intermediary facilitate communication with other healthcare professionals in order to prevent future conflict …. We do not believe that he will be able to sustainably maintain an independent practice of medicine without compromising patient safety, professional relationships and medical staff responsibility …. No limitations short of revocation would adequately address the foundational deficits we believe exist, based on a preponderance of the evidence.

(*Id.* at DHA_4199.)

The DHA privileging authority adopted the peer review panel's findings and decided to revoke Barnett's privileges on February 12, 2025, and that decision was upheld after Barnett again appealed. (*Id.* at DHA_4263-76, 4356-59.) The final decision determined that Barnett had received all of the process due to him under the DHA Manual and that the evidence adduced at Barnett's peer review hearing supported revocation. (*Id.*) Following a bit of back-and-forth between Barnett and DHA officials, Barnett's privileges were finally revoked, and that revocation reported to the NPDB, on December 1, 2025. (*Id.* at DHA_4373-74.)

**d. <u>Procedural Posture</u>**

Dissatisfied with DHA's administrative processes, Barnett filed his Complaint (Doc. No. 1) on July 7, 2025, before the DHA's decision in this case became final. In the Complaint, Barnett alleged causes of action under the APA related to the revocation of his clinical privileges and the Air Force's attempt to administratively separate Barnett from service. (*Id.* at PageID 6.) In ruling on the government's motion to dismiss (Doc. No. 39), the Court did away with Barnett's claims regarding administrative separation from the Air Force on January 20, 2026, as no final administrative decision had been handed down on that issue. (*See* Doc. No. 77.) However, by January 20, 2026, the DHA had issued a final administrative decision to revoke Barnett's privileges and the Court permitted Barnett's APA claim to proceed along those lines. (*Id.* at PageID 621.)

The Court subsequently set a timeline for the DHA to file the Record in this case and for the Parties to file their respective dispositive motions. (*See* Doc. No. 81.) The DHA filed the Record on April 6, 2026 (Doc. No. 86), and later re-filed the Record on May 13, 2026 (Doc. No. 90), due to clerical errors made in the original filing on April 6. Barnett filed Plaintiff's Motions on April 30, 2026, and June 18, 2026, respectively. (*See* Doc. Nos. 88 & 96.) In turn, the DHA filed Defendant's Motion on June 18, 2026. All of these dispositive Motions have now been fully briefed and are ripe for review and decision.

## II. LEGAL STANDARD

Typically, the Court considers dispositive motions, like the ones at bar, pursuant to Fed. R. Civ. P. 56, but "[u]nder the [APA], when a district court is reviewing final agency action, the usual rules governing summary judgment do not apply." *Integrity Gymnastics & Pure Power Cheerleading, LLC v. U.S. Citizenship & Immigr. Servs.*, 131 F. Supp. 3d 721, 725 (S.D. Ohio 2015) (citing *City of Cleveland v. Ohio*, 508 F.3d 827 (6th Cir. 2007); *North Carolina Fisheries Ass'n., Inc. v. Gutierrez*, 518 F. Supp. 2d 62 (D.D.C. 2007)). The APA creates a right of judicial review for "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court …." 5 U.S.C. § 704. Once an agency takes final action "[a] preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review of the final agency action." *Id.*

Upon review of final agency action under the APA, "the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." 5 U.S.C. § 706. Though, as relevant to the instant action, a reviewing court shall only "hold unlawful and set aside agency action,

findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law….” 5 U.S.C. § 706(2)(A).

“The scope of this review ‘is narrow,’ and reviewing courts must exercise appropriate deference to agency decisionmaking and not substitute their own judgment for that of the agency.” *Food & Drug Admin. v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 567 (2025) (quoting *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 462 U.S. 29, 43 (1983)). An agency’s final “decision is entitled to a presumption of regularity.” *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). To that end, “[w]hen assessing whether an agency’s action was arbitrary or capricious, a court simply ensures that an agency has acted within a zone of reasonableness ….” *Sierra Club v. United States Env’t. Prot. Agency*, 161 F.4th 934, 942 (6th Cir. 2025) (citing *Fed. Commc’ns. Comm’n. v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)) (internal quotation marks omitted).

In considering whether an agency has acted within a zone of reasonableness, the reviewing court must question whether the agency “has reasonably considered the relevant issues and reasonably explained [its] decision.” *Id.* (internal quotation marks omitted). In translation, “an agency must provide a satisfactory explanation for the decision, including a rational connection between the relevant facts and the decision made.” *Sierra Club*, 161 F.4th at 941-42 (citing *Motor Vehicle Mfrs.*, 463 U.S. at 43). “A court may not vacate an agency’s decision unless the agency ‘has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is [highly] implausible[.]’” *Id.* (alterations in original). Perfection is not required and courts “should ‘uphold a decision of less than ideal clarity if the agency’s path

may reasonably be discerned.'" *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 513-14 (2009) (quoting *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)).

"An agency's factual findings are reviewed under the substantial evidence standard." *Integrity Gymnastics*, 131 F. Supp. 3d at 726 (citing *Steeltech, Ltd. v. United States E.P.A.*, 273 F.3d 652, 656-57 (6th Cir. 2001)) (internal quotation marks omitted). By this standard, a court's review is further limited "to determining whether the agency's factual findings are supported by substantial evidence on the record as a whole, not whether there was substantial evidence in the record for a result other than that arrived at by the agency." *Id.* When making any of the determinations set forth in this section, "the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error." 5 U.S.C. § 706.

## III. ANALYSIS

Before getting to the heart of Barnett's APA claim, the Court takes pause to address a preliminary issue: the Court will deny Plaintiff's Motion for Clarification and Request for Limited Redaction (Doc. No. 100). With that motion, Barnett argues that the DHA inappropriately referred to his mental health diagnoses of narcissistic personality disorder and attention deficit hyperactivity disorder, when responding to Barnett's prior motion to complete the administrative record. (*Id.*) By a separate order, the Court has already denied Barnett's motion to complete the administrative record (Doc. No. 102), so his Motion for Clarification and for Limited Redaction is now likely moot. Even if the motion cannot be considered moot, it is unfounded all the same. When the DHA referred to Barnett's diagnoses, it did so in response to Barnett's assertion that the Record contains information related to those diagnoses, but that the Record contains insufficient material to fully review such information. (*See* Doc. No. 94 at PageID 6905.) In other words,

Barnett opened the door to discussion about his mental health diagnoses. Indeed, a report containing those diagnoses is attached to Barnett's Complaint as well. (Doc. No. 1-2 at PageID 35-36.) It would be wholly unfair to allow Barnett to invoke certain facts to support his arguments and then bar the DHA from responding in-kind. Thus, Plaintiff's Motion for Clarification and Request for Limited Redaction (Doc. No. 100) is **DENIED**.

More substantively, the Court finds it most appropriate to analyze Barnett's APA claim based on the clinical adverse actions he faced. Accordingly, the Court proceeds by first considering Barnett's APA claim in relation to the first administrative action he was subjected to, which resulted in a reinstatement of clinical privileges with monitoring and evaluation, before considering the administrative action that ended with the ultimate revocation of Barnett's privileges altogether.

**a. <u>Barnett's First Clinical Adverse Action</u>**

**1) <u>Opening of the Quality Assurance Investigation</u>**

Throughout Plaintiff's Motions, Barnett claims that the QAI initiated against him on May 17, 2023, was so defective as to offend his rights and violate the APA. To synthesize, Barnett argues that the scope of this QAI expanded without justification and that he was denied the opportunity to take part in forming the record underlying the QAI report, issued on July 20, 2023. (*See* Doc. No. 96 at PageID 6947-48, 6951-52.)

Alas, Barnett's contentions in this regard are unavailing. The APA creates a right of judicial review for "person[s] suffering legal wrong because of agency action …." 5 U.S.C § 702. Under the APA, the phrase 'legal wrong' refers to the "invasion of a legally protected right." *Paducah Junior Coll. v. Sec'y. of Health, Ed. & Welfare*, 255 F. Supp. 147, 150 (W.D. Ky. 1966). In this instance, no part of the QAI constituted an invasion of Barnett's legally protected rights.

Barnett does not have a protected interest in being free from QAI in his role as a physician. He similarly does not have a right to shape the evidence compiled against him. Hence, the Court finds that Barnett cannot rest his APA claim on objections to the DHA's QAI process.

**2) <u>Summary Suspension</u>**

The Court turns next to a consideration of the summary suspension imposed upon Barnett on May 9, 2023. While Barnett's arguments on this front are not particularly coherent, the Court can liberally construe Barnett's filings to make out a couple of key positions. By one token, Barnett submits that he was prejudiced by the DHA's failure to provide him same-day notice of his summary suspension on May 9. (*See generally* Doc. No. 88.) On the other hand, Barnett claims that the procedural defects revolving around his summary suspension were so vast that the Court cannot meaningfully determine whether the DHA's decision to summarily suspend Barnett's privileges was arbitrary or capricious. (*See generally* Doc. No. 96.) The Court takes each of Barnett's assertions in turn.

**i. <u>Same-Day Notice and Procedural Due Process</u>**

Regarding notice, the Court finds that the DHA's failure to provide Barnett with same-day notice of his summary suspension on May 9, 2023, contrary to DHA Manual requirements, was harmless error. Barnett decries this lack of same-day notice, arguing that it "deprived [him] of the opportunity to meaningfully respond during the initial portion" of the QAI process. (Doc. No. 88 at PageID 5298.) Yet, pursuant to the DHA Manual, Barnett would not have been granted this opportunity if he had been notified of his summary suspension on May 9, 2023. Barnett did not acquire the right to offer a response in the clinical adverse action process until the QAI was completed and a recommendation made. To be sure, Barnett took advantage of the opportunity when he received a redacted version of his first QAI on July 20, 2023. As such, the Court finds

that Barnett was not prejudiced by the DHA's failure to notify him of his summary suspension until May 17, 2023.

Beneath the surface of Barnett's gripes about the QAI process is a much more salient complaint that he was deprived of procedural due process when his clinical privileges were summarily suspended without a hearing. The Court will liberally construe Barnett's filings to raise such an argument.

Even so, the Court finds that Barnett was not deprived of due process by virtue of his summary suspension. At bottom, "the [APA] separately provides for setting aside agency action that is unlawful …, which of course includes unconstitutional action." *Fox TV Stations*, 556 U.S. at 516 (internal citation and quotation marks omitted). Regarding procedural due process, the Supreme Court has "consistently held that some form of hearing is required before an individual is finally deprived of a property interest." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (collecting cases). Practically speaking then, to determine the applicability of procedural due process, courts must first "identify a property or liberty interest entitled to due process protections." *Brock v. Roadway Express, Inc.*, 481 U.S. 252, 260 (1987) (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538-39 (1985); *Bd. of Regents v. Roth*, 408 U.S. 564 U.S. 576-78 (1972)). "'Once it is determined that due process applies, the question remains what process is due.'" *Brock*, 481 U.S. at 261 (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)). In all, "[t]he fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews*, 424 U.S. at 333 (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).

When an individual's liberty interest is temporarily restricted pending review, as was theoretically the case with Barnett's summary suspension, whether the individual should be

entitled to a predeprivation hearing "requires consideration of three distinct factors: [f]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the [g]overnment's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail." *Mathews*, 424 U.S. at 335 (citing *Goldberg v. Kelly*, 397 U.S. 254, 263-71 (1970)).

Here, the Court assumes, without deciding, that Barnett had a protected property interest in his privilege to practice medicine at WPMC, which was adversely affected by summary suspension on May 9, 2023. The only question is whether Barnett was otherwise entitled to a predeprivation hearing before the summary suspension of his privileges took effect.

The Court answers this question in the negative. In the way of private interest, the Court notes that Barnett's privileges to practice at WPMC were certainly adversely affected by summary suspension. Nonetheless, the Court finds that summary suspension created little risk of erroneous deprivation. By its very nature, the summary suspension of Barnett's clinical privileges was only temporary. If it were erroneous, the ensuing QAI would reveal as much and the DHA could swiftly take corrective action. The risk of erroneous deprivation that did exist could have been alleviated by affording Barnett an opportunity to be heard before summarily suspending his privileges. But, to provide such a hearing would actively undermine WPMC's "important interest in quickly dealing with incompetence and debilitating personal frictions …." *Black v. Barberton Citizens Hosp.*, 134 F.3d 1265, 1268 (6th Cir. 1985) (citations and internal quotation marks omitted). Recall the DHA only suspended Barnett's clinical privileges after receiving a barrage of credible allegations that Barnett was behaving in a way that endangered patient safety. Surely, the DHA

must have some leeway to suspend physicians without jumping through the hoops of an administrative hearing if the agency believes the wellbeing of patients to be at stake.

Rather, Barnett was provided with a meaningful opportunity to be heard once the QAI was completed. This too comports with due process because Barnett's response to clinical adverse action would have been most appropriately reviewed with the benefit of evidence collected during the QAI. *Brock*, 481 U.S. at 266 (observing in dicta that "[t]o allow the employer and employee an opportunity to test the credibility of opposing witnesses during … investigation would not increase the reliability of the preliminary decision sufficiently to justify the additional delay"). Otherwise, the DHA would have been left to conduct an administrative hearing on little more than "he said/they said" dynamics. Thus, the summary suspension of Barnett's clinical privileges on May 9, 2023, did not run afoul of Barnett's right to due process.

#### ii. <u>Arbitrary and Capricious</u>

The Court further finds that the DHA's decision to summarily suspend Barnett's clinical privileges in May 2023 was neither arbitrary nor capricious. To start, the Court simply disagrees with Barnett's assessment of the Record. In accord with what the Court has previously stated, Barnett's litany of irrelevant questions regarding the Record are little more than thought exercises, assuming that some information must be missing from the Record because Barnett personally believes more *should* be in there. But, as should be made apparent by the extensive facts set forth above, the Record contains ample material to conduct a meaningful review.

Moreover, the DHA's decision to summarily suspend Barnett's privileges was entirely rational. By the time the DHA suspended Barnett's clinical privileges in May of 2023, the agency had received a critical mass of allegations against Barnett, dating back to at least March 2023. Those allegations were not trivial, but called into question Barnett's ability to practice safely and

professionally. With the sheer number of complaints made to the DHA about Barnett—to say nothing of Barnett's checkered background—it makes sense that the agency would suspend his privileges until it could get a handle on whether the allegations had merit. To be sure, this would seem the best way to ensure patient safety. Therefore, the summary suspension of Barnett's clinical privileges on May 9, 2023, was not violative of the APA.

**3) <u>Reinstatement with Professional Monitoring and Evaluation</u>**

As a final note on Barnett's first clinical adverse action in this matter, the Court finds that Barnett's APA challenge to the reinstatement of his privileges with monitoring and evaluation fails for much the same reasons as his challenge to the QAI. To reinstate Barnett's clinical privileges is the opposite of injurious. Further, Barnett had no legally protected interest in practicing medicine without monitoring and evaluation. Indeed, the DHA manual explicitly states that monitoring and evaluation plans are not to be characterized as adverse actions in the first place. The Court can see nothing in the Record to suggest that monitoring and evaluation somehow limited Barnett's clinical privileges in a legal sense. If anything, monitoring amounted to an employee performance tool. Accordingly, the DHA's choice to reinstate Barnett's clinical privileges with monitoring and evaluation did not offend the APA.

**b. <u>Barnett's Second Clinical Adverse Action</u>**

With respect to the second clinical adverse action, which resulted in the revocation of Barnett's clinical privileges, Barnett is remarkably silent. He instead spends the entirety of Plaintiff's Motions arguing for the reversal of the first clinical adverse action he faced, beginning in May 2023. Regardless, the Court finds that the DHA's final decision to revoke Barnett's clinical privileges was neither arbitrary nor capricious.

As detailed above, the Record establishes facts that place the DHA's final decision within a zone of reasonableness. Barnett himself testified that he did not always timely update medical charts after having a patient encounter, despite the terms of his monitoring and evaluation plan requiring that he complete all charting responsibilities on the same day as his patient encounters. What is more, Barnett attested that he would continue to use higher-risk treatments like 3% saline and immunosuppressants out of confidence—or perhaps hubris—in his own abilities. Finally, the Record contains plenty of communications between Barnett and his colleagues to support the notion that Barnett's personality leads him to behave unprofessionally when things do not go his way. Barnett was not bagging groceries, he was treating patients and he could reasonably be said to have endangered their safety. When trying to run a medical facility, it was perfectly rational for the DHA to find that Barnett's behavior posed too great a risk to tolerate. As such, the Court upholds the DHA's final decision to revoke Barnett's clinical privileges.

## IV. CONCLUSION

Based on the foregoing, the Court hereby **DENIES** Plaintiff's Renewed Motion for Partial Summary Judgment (Doc. No 88), Plaintiff's Motion for Judgment on the Administrative Record (Doc. No. 96), and Plaintiff's Motion for Clarification and Request for Limited Redaction (Doc. No. 100). By contrast, the Court hereby **GRANTS** Defendant's Motion for Judgment on the Administrative Record (Doc. No. 97). Barnett's Complaint (Doc. No. 1) is accordingly **DISMISSED** and the Clerk is directed to **TERMINATE** this matter on the Court's docket.

**DONE** and **ORDERED** in Dayton, Ohio, this Friday, August 14, 2026.

s/Thomas M. Rose

THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE